Our next case is number 222118 Sony Interactive Entertainment LLC versus Intellectual Pixels Limited. Mr. Dowd. Thank you your honor. So this appeal centers on just one limitation that's recited in all of the challenge claims of the 109 patent which is the step of quote generating at least one updated image. Sony's prior reference here is called Wilshire and it expressly disclosed a client server gaming system where it updated image updated quote image is generated close quote when the state of a game program running on Wilshire server is updated. Patent owners preliminary response admitted that Wilshire disclosed a server generating updated images. The board's institution decision acknowledged that Wilshire disclosed generating updated images and that IPL had not disputed that limitation. The patent owner's response admitted that Wilshire disclosed again I'm quoting and this is from A4261 Wilshire disclosed that an image generated by a game program. Can I just interrupt so you won't run out of time again. Look what do you say you've got an APA argument here and you've got a substantive argument. Where does the I just want to see where you're taking us. The APA argument would be you were caught by surprise. You didn't ever know they were going to construe it. So that does that entail then a remand to the board so that you will have the opportunity to make arguments on claim construction. And how does that juxtapose with your substantive argument. What are you seeking is relief in the substantive argument. A reversal of the way the board construed the claim. A reversal of the obviousness determination. What I think your honor has it. And the way I would describe it is there is a substantive claim construction error which is reviewed de novo. The term generating was misconstrued as precluding generating by use of pre-existing images. And OK so even if we were hypothetically to agree with you on the claim construction point. What's the farthest one could go in terms of a remand. It would be the board. There are still other issues for the board to consider even if we reject the board's theory on generating. Right. There's compressing their other limitations. So this case wouldn't be over. It would just be go back to the board to deal with the other limitations. I think that's correct your honor. It would result in issues related to compressing and stuff in this case. There are unresolved issues and your honor is correct. It would result in a remand with direction under the correct claim construction. I think that's what you mean. Two or one you are making a claim construction argument. I thought you were also arguing that even under the board's claim construction that Wilshire still discloses generating because of the doom reference and figure two. I think that is true your honor. So if you were to find both at the claim. Well if you were to find that the claim construction was wrong you could still find that this generating limitation was right. If we found the claim construction is correct you still are seeking to have the case vacated and remanded. Based on the disclosures within Wilshire itself. Yes your honor. And the fact that it expressly refers to generating. It does. And so what happened here is you have a limitation generating. You have a prior reference that expressly discloses generating and the board engaged in a claim construction for the first time in its final written decision that was different than what it said in its ID. Its ID said that the disclosure of generating in Wilshire was enough for the limitation. It then changed its construction to say the disclosure of generating in Wilshire is different. Generating means something different in Wilshire than it does in the 109 patent. That is both a claim construction issue. What did they say generating means in the 109 patent? So they said for the 109 patent they say generating requires. Generating requires creation of a new image in response to updating the state of the interactive software application. That is 820. And at 822 they follow up by stating selecting a preexisting image does not meet the generating limitation. So they create this mutually exclusive definition where on the one hand they say the 109 patent does not cover if you're selecting images and compiling them to create a new composite. On the other hand they say Wilshire doesn't disclose generating. But as Judge Dyke you are correct it absolutely discloses generating. It discloses it expressly. We don't care about the claim construction if we conclude that the board is wrong and Wilshire does disclose generating a new image, right? I think that's true. But to Judge Post's point I think there are still, there's still a compressing issue. And so that would still result in a remand. Would you say, what is the, what we need to look at is whether there's substantial evidence to support the board's finding that Wilshire doesn't teach generating. Do you think there's anything in the expert report, I guess intellectual officials experts report that talks about Wilshire not teaching generating alone? I think Dr. Hart who is the expert for IPL actually conceded that generating is disclosed in Wilshire. It did so pretty expressly. His point, let me get there. So it starts at A3117 and carries over to A3118. And here just to set the stage, Dr. Hart is addressing the compressing limitation. And your honors will appreciate that this is a method where you generate an image and then the next step after the image has been generated is to compress. And then to transmit, right? And then finally you transmit. And so starting in paragraph 61, Dr. Hart is addressing the sequence, but he's addressing the compressing limitation and he is accepting that the image generated by the game program running on the server host computer of Wilshire has already happened. So he's saying that the image generated by the game program running on the server host computer of Wilshire in 62, he repeats. I don't think your characterization of his testimony is correct. I think he's saying that Wilshire discloses generating if by that you mean the generating of a new image. I don't see that he says that. But what he's saying is that Wilshire, he's objecting to whether there's compression of the image generated by the game program running on the server host computer of Wilshire. Is it more fair to say that he never challenges whether wheelchair teaches generating an image? He certainly doesn't do that. And we can see in the patent owner response. I mean he never expressly says wheelchair generates an image, right, period, full stop. But he certainly doesn't ever say that wheelchair doesn't generate an image either. I would agree he does not challenge that Wilshire discloses generating. And if we go to the patent owner response. But he doesn't address the question of whether Wilshire discloses generating a new image. Well, what he does say is, he does say, and this is why I was going to paragraph 63. Answer my question. He doesn't say that. He says image elements generated by the game program, referring to Wilshire. But that's in the context of. You know, you need to come here and answer the questions if something isn't there to admit that it's not there. It's not there. He doesn't say that Wilshire discloses generating a new image. You may still win, but not because their expert admitted you were right. Fair enough, Your Honor. I just need to say, if we go to the patent owner's response, it does say, and I'm just quoting from A4261, Wilshire disclosed that an image generated by a gaming program located on the server was transmitted to the client over a network. To me, that's a pretty direct statement. It doesn't tell us what they mean by generating, whether they mean a pre-existing image or a new image. But it's the same term, Your Honor. And so Wilshire is evidence of what a person of ordinary skill in the art would understand generating to mean. And if generating whatever it means, especially when you consider, this is part of the issue under the APA. This was not a term proposed for construction. And if you go through and you look at what the 109 patent discloses, it actually discloses that the way in which an image is generated is by selecting from a pre-existing image. It says, the visual server, and I'm on A48, column 7, line 61. Visual server receives the image modifying data from the client, where the image modifying data corresponds to an image in a graphics API recognizable to the visual server. Well, if the command corresponds to an image that's already in the server, that's a pre-existing image. And so the 109 patent discloses exactly the same thing as Wilshire. Conversely, and this is I think a key point, Wilshire discloses Doom as an embodiment of the game program running on Figure 3's system. And it does so through lexicography. It says expressly, the terms game and gaming as used herein include Doom. There was no dispute that Doom meets the generating limitation. Doom creates new images on the fly. But there is a calling out. There is, and that's the error. It defines the terms game and gaming through lexicography, in quotes, as used herein, meaning used through this patent, to include Doom. And then it invokes those terms when describing Figure 2. It says in Figure 2, game program 112, game using the definition that includes Doom. Where's your definition at? You're looking at Wilshire, what, column 2? The definition is column 1, which is A1340, starting at line 26. The terms game and gaming as used herein include, and then down at line about 38, video-based games such as Doom. Does Figure 2 have a question mark under display update image? That is a decision box. It's deciding based on the command that's been received. The game decides, do I need to change something on the display? Do I need to update the display? And if the answer is yes, that's explained on A1343, column 7. It says, initially, and I'm reading now from line about 8, game program 112 is executed on the server host computer. So we've seen that that game can be Doom. It's defined to include Doom. And then at line about 18, the image is generated by game computer program 112 and is passed on. So game computer program is defined to include Doom, because that's the definition of game. And that error is fatal to the analysis of the board. What did your expert say about the Doom references and the specifications? He went through and explained how it generates in real time. And he even, I think, reproduced images from Doom. Show me where he discusses this. My recollection is he said Doom requires a new image, right? It requires generating images in response to inputs. The question is, does it require a new image if we accept the board's claim construction? Oh, I think I have your honor. Yes, he does. And I think he describes that at 82316 to 317. And there he's saying, using preloaded images or preexisting images would not make sense for interactive games like Doom, which generate updated images in response to user inputs in real time. And that was what the board said would meet its definition of generating. Can I ask you about Column 7 quickly? One of the things that I was thinking as part of the problem in understanding this reference may be that it talks about sending the image and says that it could be all these different kinds of things, including files. But then it goes back in time and talks about generating the image, right? You know, it's a little out of order. And then it talks about first you determine, is an image required? And then you determine the image may be sent. And then it says the image is generated. Typically, wouldn't sending the image occur after the image is generated? It would, your honor. And I see I think I'm in the same portion of Column 7. What it's describing are simply types of different file types that could be used for transmission. So that step that's referring to the file is referring to something that occurs, that's made after the image is generated? So the sequence, as I understand it, is the image is generated. It is then transmitted. Right. And just to add a little bit more, I'm referring to flowchart. Is an image required? Then the image is generated. Then it's sent and it might be sent as, for example, an MPEG file. Right. And you can see that we're right now in between Steps 220 and 230 in Figure 2, where you're deciding, do I need to update? And then if I do, then I'm sending the video. This discussion in Column 7 kind of fills in that, what happens in between those two steps. And it says that the game program running on the server generates the image to be transmitted. And that, we would submit, is a disclosure of this limitation from the 109 patent. Okay. Thank you, Mr. Dan. Thank you, Your Honor. Thank you, Your Honors. This appeal should be affirmed for one simple reason. That is, the board's finding that Wilshire does not disclose generating an updated image in response to updating the state of the interactive software application is supported by substantial evidence. I'm having some difficulty with that. Your expert didn't say that about Wilshire. Their expert said that Wilshire discloses generating a new image. The specification, Figure 2, confined with definition of game to include Doom, seems to recognize that a new image is generated, at least for some games, including Doom. How can the board reach the conclusion that it did? What's the support for? So, Your Honor, there are multiple things. Let's start with the basic embodiments that are actually described in the specification. And we'll push aside Doom for a moment. The embodiments that are described are casino games. And the board... I don't understand how you can put aside Doom. That's the problem. So, let me jump to that, Your Honor. First, Wilshire never describes Doom in conjunction with Figure 2. Can I interrupt you for a minute? Wilshire, in its preferred embodiment, does specifically say an image is generated by game computer program 112. And I don't see anything in your expert's submission saying anything about how that sentence means other than that it generates an image in the same way that the patent suit does. Because he does have arguments that there's no generation followed by compression followed by transmission. But there's no argument that it doesn't generate an image when it says, specifically, expressly, that it generates an image. So, first, Your Honor, I think he does say that because he says the image can just be a pre-existing image. And if it's a pre-existing image, it's not being generated. It can be. It can be, yes. In some embodiments, it can be. It can be. That means nothing. The question is whether in some embodiments it's generated. Right? Because we're looking for what the reference teaches. And even if sometimes images come from a pre-existing file, that doesn't mean that the reference doesn't sometimes generate an image. That's correct, Your Honor. On the second point, my second point in relation to that is whether our expert says anything at all or not, does not determine whether Sony has met its burden of showing that the reference affirmatively discloses this limitation. And there is no disclosure in this reference. And Sony cites to none that these images are generated in response to updating the state of the interactive software application. The passage in Column 7 says nothing about when these images are generated. And if we turn over to Column 8... And your argument on the in-response portion of the limitation, does the Board cite that at all? Those words, in response to? Absolutely, Your Honor. Let's take a look at appendix page 20 from the Board's final written. The ultimate dispute here before the parties and what leads Sony to assert falsely that there's been a claim construction is whether pre-existing images can satisfy the limitation. That was the dispute. That's a different question. I thought you were arguing that there was something in the Board's decision about not satisfying the in-response to. In other words, maybe generating includes old images and new images, but it doesn't somehow satisfy the in-response to. That's correct, Your Honor. If we look at appendix 20... But 20 is the claim construction. I disagree, Your Honor. I don't think it's a claim construction. I think it's a finding of fact. The Court says we agree with Patent Owner that generating an updated image, as claimed, requires creation of a new image in response to updating the state of the interactive software application. Well, that last part, in response to updating the state of the interactive software application, is simply repeating the plain saying. So where is it that the Board says Wheelchair doesn't teach the part about in response to updating the state of the interactive software application? Over at appendix 26, Your Honor. The second sentence from the top of the page. Petitioner does not argue these pre-loaded images are generated in response to updating the state of the interactive software application as required by the claims. Sony didn't even challenge this before the Board. And now they're coming and saying, no, no, no, that satisfies the claim. There was a claim construction that excluded this. Wait, wait, hang on. That's only... We're assuming, of course, that we agree that the only images created by Wheelchair are pre-loaded. Of course, it all goes together. Pre-loaded images are not going to be in response to updating the state of the interactive software application because they're pre-loaded. So they kind of go together, hand-in-hand, generating and whether the generating is in response to updating the interactive software application. Right? That's correct, Your Honor. If we look at... It's throughout their analysis, but we can turn back one page to page 25. But where is your support for the idea? You said that there's independent support apart from your expert for showing why Wheelchair doesn't generate images, I guess we'll say on the fly, or in response to the updating of the software. It's... Your Honor, the Board is addressing it right there on page 25. No, I'm asking you where's the evidence to support the Board's opinion. That's a different question. The text of Wheelchair. The text of Wheelchair. And which text? So you're relying on the fact that images are pre-existing? What I'm relying on, Your Honor, is the full disclosure of Wheelchair. Starting in column 7, where it says the image is generated by Game Computer Program 112. It does not say when. It does not say in response to user update. It just says the image is generated. There's no sequence of events there, and this is what we are... But that seems to be an argument that the Board didn't address. I think the Board... I think we're asking where did the Board rely on that argument. I don't see that. I see them saying there's no generating in Wheelchair because it requires a new image, and Wheelchair doesn't disclose generating a new image. I don't see them relying on the in response to argument that you're making. So take a look at appendix page 24. They quote Dr. Fuchs' testimony. Middle of the page, and then right after it. They say, we do not find Dr. Fuchs' testimony persuasive because Wheelchair's disclosure does not support that updating or modifying the image displayed on the client necessarily requires generating an updated image in response to the updated game state, instead of simply selecting a pre-existing image to display as argued by Pat and Oren. Again, that is the argument. Why do you think the Board used the language necessarily requires? Because they have to show that Wheelchair's silence on this point necessarily results in disclosure because it's not explicit. There's nowhere that Wheelchair says this explicitly. So they're even addressing the implicit disclosure and saying it would necessarily have to be the case because Wheelchair is silent on this point, and it's not. And so when the Board sees the word generating here in Wheelchair, they're not giving it the same meaning as what they read from the patent in suit. That's correct, Your Honor. This is not a case about the meaning of the word generating. No, I'm saying, I think it is. I think you just said the opposite. Okay, I'm sorry. I misunderstood. I'm saying that the Board saw the word generating in Wheelchair, and because Wheelchair didn't say by generating we mean creating a new image, the Board said that's not good enough. And we're going to give the word generating as used in the 602 Wheelchair patent a different meaning than our understanding of generating as used in the patent in suit. I don't think that's what they did at all. Is there a common meaning? Is there any evidence on what generating means in the field of creating images? There's none in this record because it was undisputed before the Board. What does it mean, undisputedly? Ah, creating a new image. Can I ask you about on page 25 on the Board's decision, appendix 25, it says, Wheelchair's silence on how images displayed at the client are generated. Is there a, was the Board imposing a kind of requirement that they not only have to disclose it, but they have to kind of enable it? That sounds like, what do you read into that sentence? What was the Board requiring? I think what the Board was requiring, what the Board was stating is that Wheelchair discloses that an image is generated. We can all see that in column 7. It doesn't say when, and it doesn't say that it's in response to updating the state of the interactive software application, which is what the claim requires. That's what it was saying. It doesn't say how these images, or when they're generated, because it doesn't. And Wheelchair's silence means that Sony cannot carry this burden. Well, it doesn't say when. It says, the sentence I read says, there's silence on how images displayed are updated or generated. I don't think so, Your Honor. And understand, the argument here was, Wheelchair discloses this. Not that Wheelchair renders it obvious, this particular limitation. It was, their only argument was, Wheelchair discloses this. And the Board found they did not. Can I ask you a question? Where in your papers did you argue that Wheelchair doesn't disclose generating an image where generating means creating a new image? I just don't see it in your papers. Because I think you, I read your papers as arguing that Wheelchair doesn't teach a series of things, including compressing. So, if you take a look at appendix 4281. Is it paragraph 11? Paragraph 11. Oh, it's not paragraph 11, sorry. Yeah, sorry, that's just a paragraph. It says, images preloaded onto the client are not being generated in response to updating the state of the interactive software application, as required by Claims 1 and 8. Rather, the images are pre-existing and cannot meet the requirements of Claims 1 and 8, even if they are compressed. That's a very clear argument. We made this argument over and over again throughout this section. But there's a very clear statement of it. And I'll point your honors to... But where do you say Wheelchair doesn't teach? I mean, I understand. This sentence is true, of course. Images preloaded on no client aren't generated. But where do you say Wheelchair only teaches images preloaded on a client or Wheelchair doesn't teach generating an image? Because it's, I doubt it. There is a part of Wheelchair, after disclosure of this main embodiment, where Wheelchair says, oh, the images could be preloaded. And they say could be. They don't say they are, they say could be. That's correct, your honor. And the board addressed that. And the board said, yeah, whether they're preloaded or not doesn't matter, because the implication is that they pre-exist. Okay, but what I'm asking you is a different question. I asked you kind of two questions, so I understand. Where do you say specifically that Wheelchair only teaches preloaded images and Wheelchair doesn't teach generating an image full stop? Because this, what you've referred me to, just says that images preloaded on a client are not generated. So if you take a look at page 4280, appendix page 4280, the beginning of the middle paragraph, the beginning of the middle paragraph, the beginning of the middle paragraph. So we walk through the three steps there, and we say, in particular, Wheelchair did not disclose compressing an updated image generated in response to user input as required by the claims. Your bold is on compressing an updated image. That's correct, your honor. But that's because... And the sentence prior to that says, Wheelchair doesn't describe three claim limitations in a row, generating, compressing, and transmitting. Where do you talk about generating alone? I'm just not seeing it. So 4282, the bottom of the top paragraph. We say, even if not preloaded on the client, simply selecting a preexisting image to display does not involve generating at least one updated image. Compressing the at least one updated image and transmitting. Okay. And your honors, if I can do one final thing. I want to point out something here. They make this argument that Wheelchair discloses... Discloses the use of Doom with Figure 2. The board rejected that, which is a finding of fact that is supported by substantial evidence. But if we look over here at column 12, they describe other games that can be used. And in particular, they say games, and I'm looking at column 12. This is appendix 1345. Games such as chess, backgammon, hearts, or poker can be used in place of the games described herein. Those games are described in column one. Why is Wheelchair mentioning them again if it meant to disclose all of these games in column one for use with Figure 2? Generally, when we have a prior reference we're looking at, and it teaches alternative teachings. You can either do A or you can either do B. We're supposed to read that reference for all it teaches, right? A and B? That's correct, your honor. Okay. I mean, why doesn't that apply here then? That some games wouldn't require generating on the fly as opposed to pre-made images. I mean, the fact that one of the games that's described as being used undoubtedly requires generating new frames in the way that you interpret the term. Why can't we read the reference for all that it teaches? Because, your honor, the reference doesn't specifically disclose the use of doom in conjunction with Figure 2. Why does it need to? It defines game, and game is used in Figure 2, and it defines game to include doom. Because Dr. Fuchs opines on all this detail about doom, none of that is in Wheelchair. It's unclear how this Figure 2 system would be implemented with doom, and Wheelchair doesn't tell us that. There's no dispute that doom requires a generating of new images, right? That's correct. Yes. Okay. I think we're out of time. Thank you, Mr. Wilson. Thank you, your honor. Are there any questions for Mr. Gaffney? Okay. Thank both counsel. The case is submitted.